IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL NO. 3:07CV376-C

| | |
|---|---|
| LARKEY-WRIGLEY, LLC, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COMMERCIAL DEFEASANCE, LLC, and DEFEASANCE HOLDING COMPANY, LLC,<br><br>Defendants. | **MEMORANDUM AND RECOMMENDATION AND ORDER** |

**THIS MATTER** is before the Court on the "Defendants' Motion to Dismiss" (document #18) and "Memorandum in Support . . ." (document #19), both filed November 15, 2007. The Plaintiff filed its ". . . Memorandum of Law in Opposition . . ." (document #69) November 7, 2008.[1] On December 10, 2008, the Defendants filed their ". . . Reply . . ." (document #70). In addition, on December 18, 2008, the Plaintiff filed its ". . . Surreply . . ." (document #72).

Related to the subject Motion, the Defendants also filed a "Motion for Hearing on Defendants' Motion to Dismiss" (document #74) December 19, 2008. The Plaintiff filed its "Response . . ." (document #75) December 23, 2008. On December 31, 2008, the Defendants filed their "Notice [sic] Intent Not to File Reply" (document #76).

These matters have been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), and the subject Motions are now ripe for the Court's consideration.

---

[1] The parties were permitted to conduct jurisdictional discovery during the interim period. See February 25, 2008 and August 14, 2008 Orders (document ## 49, 67).

Having carefully considered the parties' arguments, the record, and the applicable authority, the undersigned will <u>deny</u> the Defendants' "Motion for Hearing . . ." (document #74), and respectfully recommend that the "Defendants' Motion to Dismiss" (document #18) be <u>granted</u>, as discussed below.

## I. FACTUAL AND PROCEDURAL HISTORY

This is a proposed class action alleging breach of contract, breach of fiduciary duty, constructive fraud, unfair and deceptive trade practices, common law fraud, and seeking the imposition of a constructive trust. The Plaintiff is a real estate development company that initiated a defeasance of a commercial loan in 2005 to release a mortgage lien on certain office buildings in order to sell the buildings unencumbered on the open market. Defendant Commercial Defeasance, LLC is a defeasance facilitator primarily serving borrowers who form corporate entities to own and manage high value commercial real estate. Defendant Defeasance Holding Company, LLC serves as the administrative agent to the "Successor Borrower" established during the defeasance process.

A defeasance is a real estate transaction which allows a borrower to substitute a portfolio of income producing collateral for the collateral which initially secured the loan, generally the borrower's commercial real estate. This process is a necessity when the terms of the original mortgage do not allow for prepayment and the borrower thereafter seeks to sell the real estate securing the loan. In every defeasance transaction, a Successor Borrower takes the place of the original borrower and uses the income from the substituted collateral (here United States securities) to make the monthly payments on the loan.

In the subject transaction, the Plaintiff retained and paid a specified amount to Defendant

Commercial Defeasance to facilitate the defeasance. According to the Complaint, Defendant Commercial Defeasance advertises its services as having a "flat fee disclosed up front." Although the Plaintiff does not complain of Commercial Defeasance's facilitation of the process, it does allege that "despite various affirmative duties of disclosure, [Commercial Defeasance] did not explain or disclose that the transaction was structured intentionally and purposefully to generate windfall compensation for defendants and/or their affiliates." This alleged undisclosed compensation is comprised of what the parties refer to as "float" and "residual."

"Float" occurs when the income from the government securities is received by the Successor Borrower prior to the time it must make the next cash payment on the loan. Between the date when the substituted collateral generates cash proceeds and the date that the proceeds must be used to make a monthly loan payment, the proceeds are reinvested in an eligible permitted investment, such as an interest-paying money market account. This reinvestment interest is referred to as "float." The float becomes part of the substituted collateral and serves as additional security for the loan until the Successor Borrower has satisfied all of its obligations for the loan.

"Residual" income results when the terms of the loan allow prepayment as of a certain date – as here where the terms allowed prepayment three months prior to the loan's maturity date (February 11, 2012). If the Successor Borrower exercises the right to prepay the loan it must do so with its own funds because the substituted collateral is pledged to the lender and held by a securities intermediary. However, the remaining income from the government securities will often exceed the amount the Successor Borrower expended to pay off the loan. This excess amount is referred to as "residual" and is ultimately returned to the Successor Borrower.

The Defendants' alleged failure to disclose the "float" and "residual" is the essential basis

of this lawsuit. As stated in its Complaint, the "Plaintiff seeks, for itself and the Class: (1) damages in the amount of the 'Float' and 'Residual' and related compensatory damages; and/or (2) the imposition of a constructive trust over all funds wrongfully obtained by Commercial Defeasance and DHC; and, (3) with respect to the fraud counts, punitive damages."[2] The Complaint further alleges, "upon information and belief, that the funds at issue have been or are in the actual or constructive possession of Commercial Defeasance and/or DHC."

On November 15, 2007, the Defendants filed a Motion to Dismiss asserting lack of subject matter jurisdiction based on standing and ripeness pursuant to Fed. R. Civ. P. 12(b)(1), and various bases for dismissal pursuant to Rule 12(b)(6). Relevant to the Court's discussion of ripeness below, the Defendants allege that the Plaintiff's Complaint seeks damages based upon the actual receipt of float and residual, something that will not happen, if at all, until the loan has been satisfied (in 2012). On this topic, the Court has allowed the parties to conduct eight months of jurisdictional discovery and during that time compelled the Defendants to respond to certain of the Plaintiff's discovery requests.

## II. DISCUSSION

"Article III of the Constitution limits federal courts to the adjudication of actual, ongoing controversies between litigants." Deakins v. Monaghan, 484 U.S. 193, 199 (1988). "An allegation of a possible future injury does not satisfy the requirements of Article III of the Constitution."

---

[2]The Plaintiff now asserts that it also seeks as damages the management and advisory fees it paid to Commercial Defeasance in 2005. The Plaintiff makes this assertion to prove the ripeness of at least the breach of contract claim since the management and advisory fees have already been paid. However, upon examining the breach of contract claim in the Complaint, the Plaintiff explicitly seeks "damages in an amount to be proven at trial, including but not limited to the full amount of the undisclosed 'Float' and/or 'Residual' compensation received by defendants over the Class period." Not only does the Complaint not reference the fees paid as an amount of damages, but the Complaint repeatedly refers to the damages as the loss of float and residual compensation.

4

Gasner v. Board of Supervisors, 103 F.3d 351, 361 (4th Cir. 1996). "Doctrines like standing, mootness, and ripeness are simply subsets of Article III's command that the courts resolve disputes, rather than emit random advice." Bryant v. Cheney, 924 F.2d 525, 529 (4th Cir. 1991) (noting that "courts should be especially mindful of this limited role when they are asked to award prospective equitable relief instead of damages for a concrete past harm").

The ripeness doctrine "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." Reno v. Catholic Social Services, Inc., 509 U.S. 43, 58 n.18 (1993). "Ripeness is peculiarly a question of timing. . . . Its basic rationale is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." Thomas v. Union Carbide Agric. Products Co., 473 U.S. 568, 580 (1985) (internal quotations and citations omitted). "To determine whether [a] case is ripe, [courts] balance the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration." Miller v. Brown, 462 F.3d 312, 319 (4th Cir. 2006) (internal quotations and citations omitted).

A challenge to subject matter jurisdiction pursuant to Rule 12(b)(1) may be raised as either a facial or factual attack. See Cantley v. Simmons, 179 F. Supp. 2d 654, 655 (S.D. W. Va. 2002). A facial attack questions whether, accepting all of the allegations in the complaint as true, the allegations are sufficient to sustain the court's jurisdiction. Id. In contrast, a factual attack "challenges the truthfulness of the factual allegations in the complaint upon which subject matter jurisdiction is based." Id. With a factual attack, the court may consider evidence outside the pleadings without converting a motion to dismiss into a motion for summary judgment. Id. Both parties agree that the Defendants are making a factual attack on subject matter jurisdiction; "[w]hen

5

a Rule 12(b)(1) motion challenge is raised to the factual basis for subject matter jurisdiction, the burden of proving subject matter jurisdiction is on the plaintiff." Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991).

Keeping the applicable law in mind, the Court must balance this matter's fitness for judicial determination with the potential hardship to the Plaintiff of delaying such a determination. Most importantly in this regard, it is clear from the parties' briefs and accompanying exhibits that an exact determination of the amount of float and residual will not be known until 2012 when the loan is paid in full. Not only will the exact amount of damages (assuming liability is found by the Court) not be known until that time, but not even the Successor Borrower could make use of these funds prior to that time. The documents executed by the parties make both of these facts abundantly clear.

Among other documents, the parties executed a Defeasance Account Agreement in connection with the defeasance. The Defeasance Account Agreement states:

> Lender, acting by and through Servicer as herein provided, shall have the sole right to control distributions from the [Substituted] Collateral Account. . . . Intermediary shall . . . make payments to Servicer's Collection Account [monthly] in an amount equal to the Scheduled Monthly Payment [on the Note] until the Final Payment Date, on which date Intermediary shall pay . . . an amount equal to the Pay-Off Amount as set forth in the Note . . . . Any amounts remaining in the [Substituted] Collateral Account after payments are made to the Collection Account pursuant to the preceding sentence shall be held in the [New] Collateral Account until after the final payment of all amounts required under the Note and other Defeasance Documents . . . whereupon any amounts remaining in the [Substituted] Collateral Account shall be paid over to [Successor Borrower] . . . .

Defeasance Account Agreement, § 4(e). Thus, it is explicit in the defeasance transaction documents that the Successor Borrower will not receive any potential excess proceeds until after the loan is fully paid.

In addition, the Plaintiff and its Lender executed a Waiver and Consent in connection with

6

the defeasance transaction. This document contains the following provisions:

> Notwithstanding the Defeasance Requirements, Original Borrower has requested that Lender waive . . . certain of the Defeasance Requirements, as more fully described in Schedule 1. . . .
>
> * * *
>
> Schedule 1
>
> * * *
>
> 8.  Any excess amounts received in payment on the U.S. Government Securities over the monthly amounts payable to Lender under the Note for the benefit of Lender will be retained in the [Substituted] Collateral Account until final payment of all amounts required under the Note and other Defeasance Documents . . . have been paid, whereupon any amounts remaining in the [Substituted] Collateral Account . . . will be paid over to Successor Borrower.

Waiver and Consent, Recital F and Schedule 1. This provision also contemplates that any excess amounts generated by the substituted collateral will not be payable to the Successor Borrower, or anyone else, until the loan has been paid in full.

Thus, while float could potentially be generated throughout the life of the loan, these amounts are not accessible until 2012. The residual, of course, will not even exist unless and until the loan is prepaid in February 2012.

The Plaintiff argues that the existence of a bond in the amount of $113,570,000.00 demonstrates the ripeness of its claims because the float and residual from the Plaintiff's defeasance, among others, were used to underwrite and support the Bond. The Plaintiff's theory is essentially that the present value of the float and residual have already been recognized through the Bond. However, the Bond loan was conditioned on the purchase of hedge instruments and the creation of a reserve account to minimize expected differences between the estimates of the float and residual

7

and the actual float and residual received after the respective loans were paid in full.[3] The primary variable in these estimates is future interest rates – a variable which the current economic times have shown to be unpredictable.

Courts do not have the luxury of awarding damages based on even good faith estimates of future damages. See Watts v. North Carolina Dep't of Env't and Natural Res., 182 N.C. App. 178, 185-86, 641 S.E.2d 811, 818 (2007) (reversing award of future interest damages "calculated based on financial data about projected interest rates," which were too "uncertain and speculative"). See also, Johnson v. Atlantic Coast Line R.R. Co., 184 N.C. 101, 113 S.E. 606, 608 (1922) ("[i]t is universally held that damages are not to be based upon mere conjectural probability of future loss or gain").

The Plaintiff argues that North Carolina law does not require that "prospective damages [be proven] with absolute certainty" and a "reasonable showing will suffice." Pipkin v. Thomas & Hill, Inc., 298 N.C. 278, 287, 258 S.E.2d 778, 784-85. While the Plaintiff is correct that it is sometimes proper to estimate damages, these are usually cases where an exact amount of damages will never be known. See also United Roasters, Inc. v. Colgate-Palmolive Co., 649 F.2d 985, 993 (4th Cir. 1981) (allowing experts' calculations and estimates of damages where defendant's actions were the reason the exact damages would never be known with certainty). This case, however, is clearly distinguishable. Here, it is through no fault of the defendants that an exact measure of damages is not known; rather, the exact amount is not known simply because the damage has not yet occurred.

---

[3] The Bond required the purchase of one hedge instrument to minimize the risk that the float estimates were incorrect and another for the residual estimates. This means that a third party will assume the risk of interest rate fluctuations – if the float and/or residual are less than the estimates the third party loses, or if the actual amounts are greater than the estimates the third party benefits. In addition, the Bond required that loan proceeds be placed into a Reserve Fund Account equaling as much as 20% of the total estimates of future float and residual in the event that such estimates proved to be inaccurate.

The exact damages in this case (if in fact there are damages at all) will be known in 2012 when the loan is paid in full.

Accordingly, the undersigned respectfully recommends that the Defendants' Motion to Dismiss be granted.[4]

### III. ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the Defendants' "Motion for Hearing . . ." (document #74) is **DENIED**.

### IV. RECOMMENDATION

**FOR THE FOREGOING REASONS,** the undersigned respectfully recommends that the "Defendants' Motion to Dismiss" (document #18) be **GRANTED,** that is, that the Complaint be **DISMISSED WITHOUT PREJUDICE** for lack of subject matter jurisdiction.

### V. NOTICE OF APPEAL RIGHTS

The parties are hereby advised that, pursuant to 28 U.S.C. §636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within ten (10) days after service of same. Page v. Lee, 337 F.3d 411, 416 n.3 (4th Cir. 2003); Snyder v. Ridenour, 889 F.2d 1363, 1365 (4th Cir. 1989); United States v. Rice, 741 F. Supp. 101, 102 (W.D.N.C. 1990). Failure to file objections to this Memorandum with the district court constitutes a waiver of the right to de novo review by the district court. Diamond

---

[4] The subject Memorandum and Recommendation and Order does not address the Defendants' standing argument nor their alternative Rule 12(b)(6) arguments because it would be improper to proceed further once it has been determined that subject matter jurisdiction does not exist. See International Academy of Oral Medicine & Toxicology v. North Carolina State Board of Dental Examiners, 451 F. Supp. 2d 746, 755 (E.D.N.C. 2006).

v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005); Wells v. Shriners Hosp., 109 F.3d 198, 201 (4th Cir. 1997); Snyder, 889 F.2d at 1365. Moreover, failure to file timely objections will also preclude the parties from raising such objections on appeal. Diamond, 416 F.3d at 316; Wells, 109 F.3d at 201; Page, 337 F.3d at 416 n.3; Thomas v. Arn, 474 U.S. 140, 147 (1985); Wright v. Collins, 766 F.2d 841, 845-46 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum and Recommendation and Order to counsel for the parties; and to the Honorable Robert J. Conrad, Jr.

**SO ORDERED AND RECOMMENDED**.

Signed: February 11, 2009

*Carl Horn, III*

Carl Horn, III
United States Magistrate Judge